1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

CYNTHIA RODRIGUEZ,                     )     No. CV 09-8939-GW(CWx)
                                       )
                Plaintiff,             )     **STATEMENT OF DECISION**
                                       )
        v.                             )
                                       )
ROXROY C. MORGAN,                      )
                                       )
                Defendant.             )
_____)

## I.    BACKGROUND

        On December 4, 2009, Plaintiff Cynthia Rodriguez filed this action against Defendant Roxroy C. Morgan raising the five causes of action under: (1) the Fair Housing Amendments Act of 1988 ("FHAA"), 42 U.S.C. §§ 3601 *et seq.*, (2) the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12955 *et seq.*, (3) the Unruh Civil Rights Act ("Unruh Act"), Cal. Civil Code §§ 51-52, (4) the California Disabled Persons Act ("DPA"), Cal. Civil Code §§ 54-55.2, and (5) Common Law Negligence.  The matter was tried before the Court on November 30, 2010. At the close of the trial, the Court ordered post-trial briefing which was submitted in December 2010 and in January of 2011.

        Upon review and consideration of the pleadings, the pre- and post-trial filings, the testimony and exhibits proffered at trial and the arguments of counsel, the Court renders the following Statement of Decision.

## II.   STIPULATED FACTS

The following facts were stipulated by the parties and have been accepted by the Court as being true:

1.  Defendant owns a single family dwelling located at 155 E. Avenue J8 in Lancaster, California ("subject property"). Defendant uses this unit as a residential rental property.

2.  Defendant is the sole owner of the subject property.

3.  Defendant alone is responsible for the subject property's rental, management and operation.

4.  On or around April 14, 2009, Plaintiff and Defendant entered into a 12-month residential lease agreement regarding the subject property.   Under the terms of this agreement, Plaintiff's tenancy would terminate on March 31, 2010.  The residential lease agreement is referenced as Exhibit 26/Exhibit A from the parties' joint exhibit list.

5.  At all times relevant to this case, Plaintiff was receiving governmental rent subsidies through the Housing Authority of the County of Los Angeles ("HACoLA") as a participant in the Section 8 Housing Choice Voucher Program ("Section 8").

6.  Upon signing the lease agreement in mid-April, 2009, Defendant was aware that Plaintiff was a Section 8 voucher recipient.

7.  On or around June 15, 2009, Plaintiff and Defendant signed HACoLA's Housing Assistance Payments ("HAP") contract as well as the Housing Choice Voucher Program Lease Rider. The HAP contract and the Lease Rider amended the lease agreement Plaintiff and Defendant signed on April 14, 2009. Among other things, the Lease Rider provided that HACoLA would pay the Defendant $1302 in monthly rent on behalf of Plaintiff.  True and correct copies of the HAP contract and the Lease Rider are incorporated by reference hereto as Exhibit 25/Exhibit B from the parties' joint exhibit list.

8.  Defendant received a handwritten letter, addressed from Plaintiff to Defendant and dated July 1, 2009, in which the Plaintiff requested Defendant's consent to terminate her lease agreement early. A true and correct copy of this letter is incorporated hereto as Exhibit 68/Exhibit D from the parties' joint exhibit list.

9.  On or around September 8, 2009, Defendant received a telephone call from Marisol Arzate, an employee of the Housing Rights Center, on behalf of Plaintiff.

10.  Defendant received a letter dated September 14, 2009 from Ms. Arzate requesting early lease termination as a reasonable

accommodation on behalf of Plaintiff.

11.    Defendant did not respond to Ms. Arzate's September 14, 2009 correspondence.

12.    Defendant received a letter dated September 25, 2009 from Ms. Arzate, requesting early lease termination as a reasonable accommodation on behalf of Plaintiff.

13.    Defendant did not respond to Ms. Arzate's September 25, 2009 correspondence.

14.    Defendant received a letter dated October 7, 2009 from Sara Kunkel, attorney for the Housing Rights Center, requesting early lease termination as a reasonable accommodation on behalf of Plaintiff Cynthia Rodriguez.

15.    Defendant did not respond to Ms. Kunkel's October 7, 2009 correspondence.

16.    Defendant did not grant Plaintiff's request for accommodation "due to [it] being an unreasonable request."

17.    Plaintiff filed her Complaint in this matter on December 4, 2009.

18.    Plaintiff remained a tenant at the subject property until April 13, 2010.

*See* Docket No. 28.

## III.    **FURTHER FACTS**

Plaintiff testified (and there was no contrary testimony or evidence at trial) that she suffers from the following medical conditions: diabetes, depression, arthritis and anxiety. *See* Reporter's Transcript of Court Trial, November 30, 2010 ("RT") at page 13.  She has been a diabetic for over ten years and must check her blood sugar every day and take medication each morning. *Id.*  As a result of her diabetes, she gets headaches and blurred vision; her knees bother her; daily tasks like cleaning house and driving become limited and, on occasion, she cannot perform them at all. *Id.* at 14-15.  Plaintiff's physician is Dr. Khuloody Cotta in Bell, California. *Id.* at 14, 20-21.  Her depression began about four years ago following the deaths of her mother and her brother two months thereafter. *Id.* at 18.  That depression makes it difficult for her to sleep and to do things with her young son. *Id.* at 19.  Her anxiety causes her to get headaches, chest pains, "anxiety attacks," and makes her forgetful and listless. *Id.* at 20.  Plaintiff did not proffer any significant evidence as to the limitations which her arthritis has caused her.

-3-

1    About one month after moving into the subject property, her health problems became

2    exacerbated. *Id.* at 23.  When they worsened, she would try to see Dr. Cotta.  Sometimes she would

3    be able to drive the 81 miles from the subject property in Lancaster to Dr. Cotta's office in Bell,[1] but

4    most often she could not make that trip herself.  *Id.*  She was not able to locate friends to take her.

5    *Id.* at 24.  She tried public transportation but it was difficult not only because it entailed taking the

6    Metrolink and then two different bus routes, but Plaintiff is claustrophobic and got headaches,

7    nausea and became lightheaded during the journeys.[2] *Id.*  Plaintiff did not want to change doctors

8    because she had been Dr. Cotta's patient for many years.  *Id.* at 25-26.  As a result of not being able

9    to get to Dr. Cotta, when her symptoms became extremely bad, she would go to the emergency

10   rooms at various hospitals in Lancaster.  Admitted into evidence at the trial were Plaintiff's medical

11   records from those emergency rooms which indicated that Plaintiff had sought treatment for anxiety,

12   headaches, chest pains, blurred vision, and/or diabetes related problems on July 15, 2009 (Ex. 52),

13   November 11, 2009 (Ex. 43), December 28, 2009 (Ex. 21), January 25, 2010 (Ex. 18), and January

14   26, 2010 (Ex. 39).

15   Defendant never attempted to engage in any interactive process with Plaintiff or the Housing

16   Rights Center when it was acting on Plaintiff's behalf.  He testified that he contracted Karen Hunter

---

[1]    The Court takes judicial notice as per Plaintiff's Request for Judicial Notice ("RJN") (*see* Doc. No. 22) Exhibit E, that the distance from the subject property to Dr. Cotta's office is about 81 miles.  *See* Federal Rules of Evidence 201(b); *Harris v. Del Taco, Inc.,* 396 F. Supp. 2d 1107, 1110 (C.D. Cal. 2005).

[2]    The Court notes that there is a slight inconsistency in the evidence regarding when Plaintiff was able (and was not able) to get to Dr. Cotta's office in Bell (and why) after she moved into the subject property in Lancaster.  Exhibit 8 consists of phone records of the Housing Rights Center where Plaintiff sought assistance in dealing with Defendant.  In a conversation on August 31, 2009, Plaintiff is reported to have said that Dr. Cotta "asked her why she hasn't seen in her six months [sic] . . . ."  Plaintiff's response was that "she didn't have gas money and could not drive to her office sometimes because she felt sick."  Dr. Cotta's medical records indicate that Plaintiff was treated in the Bell office on February 11, 2009 (Ex. 64) and not again until October 8, 2009 (Ex. 63).

It is also noted that in the record of the initial phone conversation between Plaintiff and the Housing Rights Center, Plaintiff did mention her diabetes and mental disabilities but did not reference the difficulty of getting to Dr. Cotta's office as a basis for seeking an early termination of her lease.  *See* Exhibit 13.

-4-

1   Hill at the Section 8 Housing Authority about his lease with the Plaintiff, but he did not inform Ms.

2   Hill of Plaintiff's request to be let out of the lease for medical reasons and Ms. Hill did not give him

3   advice on how to proceed.  *Id.* at 80-81.  Defendant never asked Plaintiff for any medical back-up

4   for her claims, or raise with the Plaintiff or the Housing Rights Center any alternative solution to the

5   situation.  *Id.* at 94-95.  Defendant received a note dated September 9, 2009 from Dr. Cotta advising

6   him that Plaintiff "is my patient for a long time, she's Diabetic sometimes with high blood sugar and

7   is not controlled [sic], she cannot come to see me because she lives so far affecting her treatment.

8   Please help her move back to Los Angeles, any questions please feel free to call."  *See* Exhibit 4.

9   Defendant testified that he had previously rented the subject property to a couple named Harvey and

10  Laura Scott.  RT at 95.  Four months into their lease, they asked him to "break" the lease and

11  Defendant granted their request.  *Id.* at 95-97; Exhibits 33 and 77.  In 2004, Defendant was

12  convicted of three felony counts of making false or fraudulent statements and three felony perjury

13  counts.  *See* Exhibit F and H to RJN.

14  **IV.    DISCUSSION AND CONCLUSIONS**

15       **A.  Which Causes of Action Provide a Basis for a Reasonable Accommodation Claim**

16       The basis thrust of Plaintiff's case herein is her claim of being disabled and the Defendant's

17  purportedly illegal refusal to reasonable accommodate her disability (or even engage in an

18  interactive process) by allowing her to terminate (or break) her one year lease.  It is initially noted

19  that not all of her alleged causes of action would provide a basis for such a contention.

20       Clearly, the FHAA would.  As held in *Giebeler v. M&B Associates*, 343 F.3d 1143, 1146-47

21  (9th Cir. 2003):

22           The FHAA's definition of prohibited discrimination encompasses "a
             refusal to make reasonable accommodations in rules, policies,
23           practices, or services, when such accommodations may be necessary
             to afford such person equal opportunity to use and enjoy a dwelling."
24           42 U.S.C. § 3604(f)(3)(B).  Thus, the FHAA "imposes an affirmative
             duty upon landlords reasonably to accommodate the needs of
25           handicapped persons," *United States v. California Mobile Home Park
             Mgmt. Co.*, 29 F.3d 1413, 1416 (9th Cir. 1994), not only with regard
26           to the physical accommodations, *see* 42 U.S.C. § 3604(f)(3)(A) and
             (C), but also with regard to the administrative policies governing
27           rentals.

28  Likewise, the FEHA in Cal. Gov't Code § 12927(c)(1) states that discrimination in the housing

context "includes refusal to make reasonable accommodations in rules, policies, practices, or services when these accommodations may be necessary to afford a disabled person equal opportunity to use and enjoy a dwelling." Finally, the DPA in Cal. Civil Code § 54.1(b)(3)(B) states that "Any person renting leasing, or otherwise providing real property for compensation shall not refuse to make reasonable accommodations in rules, policies, practices, or services, when those accommodations may be necessary to afford individuals with a disability equal opportunity to use and enjoy the premises."

The Unruh Act, Cal. Civ. Code §§ 51-52,[3] does not contain any express provision for (or reference to) reasonable accommodation in the context of disability and housing. No case has correctly held that the Unruh Act does provide for such accommodation in the housing situation.[4] It is recognized that the Unruh Act does contain the following provision: "A violation of the right of any individual under the American with Disabilities Act of 1990 . . . shall also constitute a violation of this section." *See* Cal. Civil Code § 51(f). Under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182 covers disability discrimination in "public accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii) defines discrimination as including: "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations . . .

---

[3]    Courts have sometimes referred to the Cal. Civ. Code sections that follow section 51 (*e.g.* § 51.7) as being part of the Unruh Act. However, the California Supreme Court in *Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 667-68 (2009), observed that: "we considered the two sections [*i.e.* §§ 51 & 52] as interrelated parts of the same statutory scheme (we refer to them together as 'the Unruh Act'), with section 52 serving 'to provide as enforcement for section 51 and other provisions of law.' . . . . Although this court and others have referred to both section 51 and 52 as the Unruh Civil Rights Act, the statutory label applies more precisely only to section 51. (See § 51, subd. (a).)."

[4]    In *McAlister v. Essex Prop. Trust*, 504 F.Supp. 2d 903, 910-11 (C.D. Cal. 2007), it was noted that the Unruh Act did supposedly contain statutory language equivalent to the FHAA which required reasonable accommodation for a disabled person in the rental housing context. However, the only statutory language cited by that court was to Cal. Civil Code § 54.1(b)(3)(B), which as noted above is part of the DPA and not the Unruh Act.

1   ." However, "public accommodations" are described in part in 42 U.S.C. § 12181(7) as being "an

2   inn, hotel, motel, or other place of lodging . . . ." As noted in *Independent Hous. Servs. v. Fillmore*

3   *Ctr. Assocs.*, 840 F. Supp. 1328, 1344 n.14 (N.D. Cal. 1993), "the legislative history of the ADA

4   clarifies that 'other places of lodging does not include residential facilities. H.R. Rep. No. 101-485

5   (II), 101st Cong. 2d Sess. 383 (1990)." "Most courts addressing the issue agree that residential

6   apartment complexes aren't places of 'public accommodation' under the statute." *Worthington v.*

7   *Golden Oaks Apts.*, 2011 U.S. Dist. LEXIS 115348 *23-24 (N.D. Ind. Oct. 4, 2011) (*see also* cases

8   cited therein). This Court, therefore, finds that the Unruh Act does not require a landlord to engage

9   in reasonable accommodation of a disabled tenant as to residential housing. Thus, Plaintiff cannot

10   prevail as to her Unruh Act claim.

11        This Court also finds that Plaintiff's fifth claim of negligence in failing to provide reasonable

12   accommodation is untenable. First, the duty to provide a reasonable accommodation is premised

13   on statutory obligations and not on common law theories of negligence. If required by a statute such

14   as the FHAA or DPA, the failure to provide such accommodation is actionable under the statute

15   itself. The reason for a landlord's denial, such as his/her bad intention or negligence is irrelevant.

16   Thus, negligence cannot constitute a separate cause action for a failure to provide reasonable

17   accommodation. Second, at the trial, Plaintiff did not present any substantial evidence of actual

18   damages and/or a means for placing a dollar figure on those purported damages. *See* TR at 160.

19   Therefore, as to the negligence cause of action, the Court would find in Defendant's favor.

20        **B.  Elements of a Reasonable Accommodation Claim**

21        To establish a claim for discrimination under the FHAA for failure to reasonably

22   accommodate a plaintiff's disability in the context of residential renting, the plaintiff must meet the

23   following four elements:

24        (1) he suffers from a handicap as defined by the FHAA; (2)
           defendants knew or reasonably should have known of the plaintiff's
25        handicap; (3) accommodation of the handicap "may be necessary" to
           afford plaintiff an equal opportunity to use and enjoy the dwelling;
26        and (4) defendants refused to make such accommodation.

27   *Giebler*, 343 F.3d at 1147, *see also McGary v. City of Portland*, 386 F.3d 1259, 1262 (9th Cir.

28   2004). Those four elements, with slight variations, are needed to demonstrate disability

1  discrimination as to housing under the FEHA.  *Auburn Woods I Homeowners Ass'n v. Fair Emp.*

2  *and Housing Comm.*, 121 Cal. App. 4th 1578, 1592 (2004), provides that:

> In order to establish discrimination based on a refusal to provide reasonable accommodations, a party must establish that he or she (1) suffers from a disability as defined in FEHA, (2) the discriminating party knew of, or should have known of, the disability, (3) accommodation is necessary to afford an equal opportunity to use and enjoy the dwelling, and (4) the discriminating party refused to make this accommodation.

7  While there are no reported cases as to the elements of a reasonable accommodation claim based on

8  the DPA in the context of housing, given the similarity of the language in Cal. Civil Code § 54.1

9  (under the DPA) and Cal. Gov't Code § 12927(c)(1) (under the FEHA), this Court would find that

10  the same four elements under the FEHA criteria can establish a refusal to provide reasonable

11  accommodation claim for the DPA.

### C. Whether Plaintiff Has Met the Elements of a Reasonable Accommodation Claim

#### 1. Disability/Handicap

14  Under the FHAA, "handicap" is defined as "(1) a physical or mental impairment which

15  substantially limits one or more of such person's major life activities, [or] (2) a record of having

16  such an impairment . . . ."  42 U.S.C. § 3602(h).  Under the FEHA, a plaintiff can establish a

17  physical disability by showing "(1) a physiological disease or condition limit[s] . . . the plaintiff's

18  ability to participate in major life activities."  *See Colmenares v. Braemar County Club*, 29 Cal. 4th

19  1019, 1031-32 (2003); *see also* Cal. Gov't Code § 12926(k).  The FEHA's definition of disability

20  is broader than the FHAA's definition of handicap because under the latter, the disease/impairment

21  has to *substantially* effect the major life activity whereas, in the former, it merely has to affect the

22  major life activity.  *Id.*; *see also* Cal. Gov't Code § 12955.6.

23  Plaintiff testified (*see e.g.* RT at 13) and the medical records admitted during the trial shows

24  (*see e.g.* Ex. 49) that she suffers from diabetes and anxiety.  Diabetes qualifies as a physical

25  impairment under the FHAA, FEHA and DPA.  *See e.g. Frechtman v. Olive Executive Townhomes*

26  *Homeowner's Ass'n*, 2007 U.S. Dist. LEXIS 81125 *5 (C.D. Cal. Sept. 24, 2007); *see also Rohr*

27  *v. Salt River Proj. Agric. Improvement & Power Dist.*, 555 F.3d 850, 858 (9th Cir. 2009) ("Diabetes

28  is a 'physical impairment' because it affects the digestive, hemic and endocrine systems . . . ."); 24

-8-

1   C.F.R. § 100.201(a)(1); Cal. Gov't Code § 12926.1 ("physical and mental disabilities include . . .

2   diabetes . . . .").

3          However, the mere presence of a physical impairment is not enough; the impairment must

4   under the FEHA and DPA limit the plaintiff's ability to participate in major life activities, and under

5   the FHAA that limitation must be substantial.  As noted in *Giebeler*, 343 F.3d at 1147 "FHAA

6   regulations further define 'major life activities' to include 'functions such as caring for one's self,

7   performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.' 24

8   C.F.R. § 100.201(b)."  The FEHA also has a similar definition of major life activities.  *See e.g.*

9   *Hobson v. Raychem Corp.*, 73 Cal. App. 4th 614, 628 (1999), rev'd on other grounds *Colmenares*,

10  29 Cal. 4th 1019. Plaintiff proffered unrebutted testimony that her diabetes causes her to get

11  lightheaded and dizzy which make it difficult for her to perform daily activities like driving and

12  cleaning house; it makes her vision blurry on occasion; she cannot walk or stand at times because

13  she becomes lightheaded; and she gets headaches.  *See* RT at 14-15.  On a number of occasions,

14  when her blood sugar got out of control, she had to go to the emergency room.  *Id.* at 23.  Based on

15  that evidence, this Court would find Plaintiff to be handicapped/disabled under the FHAA, FEHA

16  and DPA.

17                    **2.  Defendant's Knowledge of Plaintiff's Handicap/Disability**

18          Plaintiff testified that, when she first asked Defendant if she could break the lease in July

19  2009, she told him it was for "medical reasons." *Id.* at 25.  Maria Arzate (from the Housing Rights

20  Center) wrote to Defendant on September 14, 2009, explaining that Plaintiff had been diagnosed

21  with diabetes and hyperglycemia and that she needed to frequently visit her doctor in Bell, which

22  was 80 miles from the subject property.  *See* Exhibit 1.  Citing to and quoting from the FHAA,

23  FEHA and DPA, Arzeta requested that Plaintiff be allowed a reasonable accommodation by way of

24  an early termination of the lease.  Defendant was also provided with a note from Dr. Cotta

25  referencing Plaintiff's diabetes. *See* Exhibit 4.  Defendant has stipulated to the receipt of the above

26  items.  Therefore, the Court finds that a Defendant knew of Plaintiff's handicap/disability.

27                    **3.  Refusal to Accommodate**

28          Defendant has stipulated that he did not grant Plaintiff's request for accommodation.

-9-

1    Therefore, that element has been met.

2    ### 4. **Was the Accommodation Necessary and Reasonable?**

3    Defendant initially argues that a tenant requesting to break or terminate a lease is not seeking

4    a reasonable accommodation because a termination of the lease by definition does not provide the

5    tenant with an equal opportunity to use and enjoy the dwelling; it precludes the tenant from using

6    the residence at all.  There is some facile logic to that contention.  However, Plaintiff has cited one

7    case which has reached the opposite conclusion.  In *Samuelson v. Mid-Atlantic Realty Co., Inc.*, 947

8    F. Supp. 756 (D. Del. 1996), plaintiff entered into a one-year lease but, within days of moving in,

9    suffered a mental impairment which caused him to be hospitalized for the next three weeks.  Upon

10   release, his psychiatrist determined that it was unsafe for him to continue to live in the apartment

11   and plaintiff notified the defendant landlord of the facts and requested to terminate the lease

12   effective in forty-five days pursuant to a state statute allowing a tenant to terminate a lease early

13   because of a serious illness.  *Id.* at 758.  After the plaintiff cleaned his apartment and turned in his

14   keys, the defendant refused to refund his security deposit and presented him with charges for the

15   remaining term of the lease, a "re-letting" fee, and charges for another clean-up.  Plaintiff filed an

16   action for failing to reasonably accommodate under the FHAA and the district court denied

17   defendant's motion to dismiss.  In doing so, that court stated:

18   > A much closer call is whether Mid-Atlantic has discriminated at all.
19   > A failure to reasonably accommodate a handicapped person is
     > considered unlawful discrimination only if an accommodation is
20   > "necessary to afford such person equal opportunity to use and enjoy
     > a dwelling." 42 U.S.C. § 3604(f)(3)(B).  *United States v. California*
21   > *Mobile Home Park Management Co.*, 29 F.3d 1413 (9th Cir. 1994),
     > is instructive on this question. In *California Mobile Home Park*, the
     > Ninth Circuit Court of Appeals considered "whether the duty
22   > imposed under the FHAA to make 'reasonable accommodations in
     > rules' on behalf of handicapped persons may require a landlord to
23   > waive, in a given instance, fees generally applicable to all residents."
     > 29 F.3d at 1414.  The management company in *California Mobile*
24   > *Home Park* had imposed a fee, for the presence of long-term guests
     > and for guest parking, on a handicapped resident who needed a home
25   > health care aide.  *Id.* at 1415.  Although the fee applied to all
     > residents, the court held the refusal to waive generally applicable fees
26   > for a handicapped resident could state a claim under the FHAA.  *Id.*
     > at 1416. Explaining that "the history of the FHAA clearly establishes
27   > that Congress anticipated that landlords would have to shoulder
     > certain costs involved, so long as they are not unduly burdensome[,]"
28   > the court cautioned against premature dismissal of FHAA challenges

to fees imposed by landlords on handicapped tenants. *Id.* The inquiry as to whether a landlord must reasonably accommodate a tenant by waiving generally applicable fees is "highly fact-specific, requiring case-by-case determination." *Id.* at 1418 (citations omitted). Further, a court should examine factors including "the amount of fees imposed, the relationship between the amount of fees and the overall housing cost, the proportion of other tenants paying such fees, the importance of the fees to the landlord's overall revenues, and the importance of the fee waiver to the handicapped tenant." *Id.*

> \*           \*           \*           \*

The factual scenarios in *California Mobile Home Park* and in the FHAA regulations both involve facially neutral policies that could adversely affect the handicapped. So, too, is the policy at issue here - the refusal to allow early termination of a lease. Further, and significantly, Samuelson was still a tenant when he effectively requested an accommodation from Mid-Atlantic's lease termination policy on June 15. Thus, this case is not materially different from California Mobile Home Park or the example in the FHAA regulations.

*Id.* at 761-62.

Whether characterizing the accommodation as allowing an early termination of the lease or as an agreement to waive fees and other costs arising from the tenant's leaving the rental unit, this Court would find that such a request can be the *staring point* of the process whereby a reasonable accommodation can be reached. As noted in *Giebeler*, the accommodation which is sought must be reasonable. "Ordinarily, an accommodation is reasonable under the FHAA when it imposes no fundamental alteration in the nature of the program or undue financial or administrative burdens. [Internal quotation marks omitted.]" 343 F.3d at 1157. If a disabled tenant's early termination would place the landlord in a financially untenable position and if that financial problem could be avoided (say by allowing the tenant to leave once the landlord obtained a new renter, if the delay would not cause the tenant undue medical concerns), those factors would have to established and considered in the decision as to whether the tenant's request to break the lease was a reasonable accommodation.[5] "The reasonable accommodation inquiry is highly fact-specific, requiring case-

---

[5] For example, if the subject property here was Defendant's only rental unit and if he was in a precarious financial situation such that an early termination by the Plaintiff here could cause him to miss mortgage payments, then Plaintiff's request to immediately break the lease would appear to be unreasonable, especially when Plaintiff presented no evidence that an immediate termination was necessary to maintain her health.

by-case determination." *United States v. California Mobile Home Park Management Co.*, 29 F.3d 1413, 1418 (9th Cir. 1994).

The problem here is that the Defendant did not respond or otherwise engage in an interactive process when he received the initial request from the Plaintiff or after he was sent the additional notices and requests from the Housing Rights Center. This Court recognizes that there is a split among the courts as to whether the FHAA requires landlords to engage in such a process with their disabled tenants. *See e.g. Jenkowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 895 (7th Cir. 1996) ("if a landlord is skeptical of a tenant's alleged disability or the landlord's ability to provide an accommodation, it is incumbent upon the landlord to request documentation or open a dialogue.") *Alamar Ranch, LLC v. County of Boise*, 2010 U.S. Dist. LEXIS 128555 *3-4 (D. Idaho Dec. 5, 2010) (applying interactive process in employment discrimination context to housing situation); *Auburn Woods I Homeowner's Ass'n*, 121 Cal. App. 4th at 1598; *Douglas v. Kriegsfeld Corp.*, 884 A.2d 1109, 1122-23 (D.C. 2005) (and cases cited therein); *see also* Joint Statement of the Department of Housing and Urban Development and the Department of Justice, <u>Reasonable Accommodation Under the Fair Housing Act</u>, at 7-8 (May 17, 2004), available at "www.justice.gov/about/hce/joing_ statement_ra.pdf" ("Joint Statement"); *contra Lapid-Laurel v. Zoning Bd. of Adjustment*, 284 F.3d 442, 446 (3rd Cir. 2002) ("declining to extend the 'interactive process' requirement that exists in the employer-employee context of the Rehabilitation Act to the housing and land-use context of the FHAA");[6] *Groner v. Golden Gate Gardens Apts.*, 250 F.3d 1039, 1047 (6th Cir .2001) (while not deciding the issue, noting that "there is no such language [as to an interactive process] in the Fair Housing Act or in the relevant sections of the Department of Housing and Urban Development's implementing regulations that would impose such a duty on landlords and tenants. *See* 24 C.F.R. §§ 100.200-.205.").

The FEHA has an explicit interactive process requirement. *See* Cal. Gov't Code § 12940(n). However, its language appears to be limited to the employment context. As stated in section

---

[6]    However, as noted by the Ninth Circuit in *Giebeler*, 343 F.3d at 1156, "this court ordinarily applies RA [Rehabilitation Act] case law in applying the reasonable accommodation provisions of FHAA . . . ."

12940(n):

> It is an unlawful practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California:
>
> \*          \*          \*
>
> (n) For an employer or other entity covered by this part to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition.

In light of the above, this Court would *not* find that the interactive process is a separate requirement under the FHAA, FEHA and/or DPA in the housing context, such that a landlord's failure to engage in it gives rise to an independent basis for finding disability discrimination. However, a landlord's nonfeasance in that regard can be considered in determining whether he or she failed to reasonably accommodate the tenant's disability/handicap.

Here, Plaintiff's initial written communication made on July 1, 2009 that she be allowed "to cancel terminate te [sic] lease contract for properable [sic] reasons as of July 1, 2009" (*see* Ex. 68) would not on its fact appear sufficient to raise the prospect of an adequate request for a reasonable accommodation of her disability. However, the September correspondence from the Housing Rights Center (*see* Ex. 1), was more than adequate to appraise Defendant of the situation. At that point, if Defendant had any questions regarding the full nature and scope of Plaintiff's disabilities or her position as to whether she would agree to anything less than an immediate termination of her lease, he should have opened a dialogue with her and/or her representative. *See Jankowski*, 91 F.3d at 895.

This Court would have accepted evidence that, based on the fact that the subject property consisted of a single house (with apparently a pool), that there could have been severe adverse financial consequences to the Defendant if Plaintiff was allowed to immediately terminate her lease.[7] Therefore, as a reasonable accommodation, if the Defendant had indicated a willingness to terminate

---

[7] There was evidence at the trial, however, that the Defendant had allowed a prior couple to terminate their lease early on grounds that would not be as significant as a tenant's disability situation.

1   the lease once he found suitable replacement tenants, this Court would have deemed that sufficient.[8]

2   However, by not responding at all to the Plaintiff's request, the Defendant must suffer the

3   consequences where it appears that he could have easily (and without serious financial consequences

4   to himself) have accommodated the Plaintiff's disability.

5          **D.  Damages/Penalties**

6          In light of the above discussion, this Court finds that Plaintiff has proven by a preponderance

7   of the evidence that she has met the elements of establishing her claims of a failure to reasonably

8   accommodate her disability/handicap under the FHAA, FEHA and DPA.

9          Nevertheless, as noted above, the Court finds that Plaintiff has not provided sufficient

10  evidence to establish, with any precision, actual damages or a way in which the Court could

11  calculate those damages.  *See* RT at 160.  While, at trial, Plaintiff's counsel indicated that she would

12  seek the statutory minimum penalty of $4,000 under the Unruh Act, *Id.*, as found above, Plaintiff

13  has not established a claim under that statute.

14         There does not appear to be any automatic or mandatory damages provision under either

15  FHAA or the FEHA.  *See e.g.* 42 U.S.C. § 3613(c).  The DPA does provide that a violation of Cal.

16  Civil Code §§ 54, 54.1 or 54.2 will render the defendant liable "for actual damages and any amount

17  as may be determined by . . . the Court . . . up to a maximum of three terms the amount of actual

18  damages but in no case less than one thousand dollars ($1,000), and attorney's fees as may be

19  determined by the court in addition thereto..." Cal. Civil Code § 54.3(a).  Thus, the Court will award

20  Plaintiff $1,000 plus an amount of attorney's fees to be determined.

21         The Court does not find that punitive damages are appropriate under the facts of this case.

22  Additionally, Plaintiff did not proffer any evidence of Defendant's financial condition.  Under

23  California law, "actual evidence of the defendant's financial condition is essential" to a

24  determination of the appropriate amount, if any, of punitive damages.  *Kelly v. Haag*, 145 Cal. App.

25  4th 910, 915 (2006).

26  _____

27  [8] Defendant testified that it took him four months to "rerent" the subject premises after Plaintiff

28  moved out.  RT at 103.

-14-

**V.**     **CONCLUSION**

      For the reasons stated above, this Court finds for Plaintiff as to her FHAA, FEHA and DPA causes of action. It further awards the statutory amount of $1,000 under the DPA and attorney's fees to be determined upon application of Plaintiff's counsel. Plaintiff is to prepare a proposed judgment.

Dated: This 26th day of January, 2012.

 

                                                      GEORGE H. WU
                        United States District Judge